554 A.2d 1002

Commonwealth of Pennsylvania, Department of Environmental Resources, Petitioner *v*. Big B Mining Company, Inc., Respondent.

*Argued October 6, 1988, before Judges* CRAIG *and* MCGINLEY, *and Senior Judge* NARICK, sitting as a panel of three.

*Diana J. Stares,* Assistant Counsel, for petitioner.

*Bruno A. Muscatello, Stephanian & Muscatello,* for respondent.

*Michael J. Boyle, Meyer, Unkovic & Scott,* for Trout Unlimited, intervenor.

*Steven J. Schiffman, Serratelli & Schiffman,* for Pennsylvania Federation of Sportsmen's Clubs, Amicus Curiae.

OPINION BY SENIOR JUDGE NARICK, February 23, 1989:

The Department of Environmental Resources (DER) has appealed from an adjudication and order of the Environmental Hearing Board (Board)[1] which reversed DER's denial of the permit sought by Big B Mining Company, Inc. (Big B) to conduct surface mining on a tract of land situated within the Silver Creek watershed.

The factual and procedural background giving rise to this appeal may be summarized as follows. In 1979, Big B applied for and was issued a permit to conduct surface mining on a tract of land in Butler County designated as the Fleming site. Mining operations were conducted on this site in 1980 and 1981. In December 1981, Big B applied for a permit to conduct surface mining on a site adjacent to the Fleming site, known as the Gould site. After a series of delays which we need not summarize, DER denied Big B's permit application in 1983 and Big B filed a timely appeal to the Board.

In 1985, Big B applied to re-permit a portion of the Fleming site which had not been mined under its previous permit. DER denied the application and Big B filed a second appeal. The two appeals were consolidated before the Board, which treated the two applications as

---

[1] At the time of the Board's action, it had only two members: Chairman Woelfling and Member Roth. The Chairman found it necessary to recuse herself and both parties consented to the Board's issuance of an adjudication based on Mr. Roth's determination and signature alone.

one, as we shall, referring to the entire site as the Gould site and to one single application.

Big B's Gould site is located approximately one mile upstream from Silver Creek. It drains into an unnamed tributary to Silver Creek, referred to by the Board as UT#1. UT#1 enters Silver Creek below the Walley Mill bridge. Silver Creek is placed in the "High Quality Waters" category downstream from that bridge. *See* 25 Pa. Code §93.9 (Drainage List S).[2] Its waters upstream from the bridge are categorized as "Exceptional Value Waters." *Id.*[3]

When DER denied Big B's permit application, it did so on the basis of 25 Pa. Code §95.1(b).[4] That section provides:

---

[2] For a listing of the symbols used in Drainage List S, *see* 25 Pa. Code §93.7(e).

[3] The Board found that Big B's operations at the Fleming site drained into another unnamed tributary of Silver Creek, which it called UT#2. UT#2 enters Silver Creek above the Walley Mill bridge. In 1984, well after mining at the Fleming site had ceased, the portion of Silver Creek above the Walley Mill bridge was upgraded to "Exceptional Value Waters" status. DER has not challenged these findings of fact.

[4] DER's brief contains extensive background information on the formulation and revision of federal water quality antidegradation policy. Pennsylvania's policy has apparently tracked the federal guidelines, whose evolutional changes have been characterized by increasing stringency to protect high quality water resources. The federal regulation, upon which the DER's regulation is based, reads, in part, as follows:

> (a) The State shall develop and adopt a statewide antidegradation policy and identify the methods for implementing such policy pursuant to this subpart. The antidegradation policy and implementation methods shall, at a minimum, be consistent with the following:

> (1) Existing instream water uses and the level of water quality necessary to protect the existing uses shall be maintained and protected.

> (2) Where the quality of the waters exceed levels necessary to support propagation of fish, shellfish, and wildlife

(b) Waters having a water use designated as 'High Quality Waters' in §§93.6 and 93.9 (relating to general water quality criteria and designated water uses and water quality criteria) shall be maintained and protected at their existing quality or enhanced, unless the following are affirmatively demonstrated by a proposed discharger of sewage, industrial wastes, or other pollutants:

(1) The proposed new, additional, or increased discharge or discharges of pollutants is justified as a result of necessary economic or social development which is of significant public value.

(2) Such proposed discharge or discharges, alone or in combination with any other anticipated discharges of pollutants to such waters, will not preclude any use presently possible in such waters and downstream from such waters, and will not result in a violation of any of the numerical water quality criteria specified in §93.9 which are applicable to the receiving waters.

25 Pa. Code §95.1(b). Because DER determined that Big B did not satisfy the first criterion of establishing that the discharges from its mine were justified as a result of

---

and recreation in and on the water, that quality shall be maintained and protected unless the State finds, after full satisfaction of the intergovernmental coordination and public participation provisions of the State's continuing planning process, that allowing lower water quality is necessary to accommodate important economic or social development in the area in which the waters are located. In allowing such degradation or lower water quality, the State shall assure water quality adequate to protect existing uses fully. Further, the State shall assure that there shall be achieved the highest statutory and regulatory

necessary economic or social development, it designed effluent limitations in order to assure that the water quality of Silver Creek would not be degraded. Big B admittedly could not design a system which would assure compliance with these limitations, and its application was therefore denied.

It was stipulated by the parties before the Board that the Gould site could be mined without causing acid mine drainage or heavy metal pollution. The threat Big B's surface mining would pose to the Silver Creek watershed is in the form of sedimentation deposits to UT#1, which could interfere with the existing natural trout reproduction.

The Board, in a 57-page adjudication, concluded that Big B had demonstrated compliance with the two criteria under 25 Pa. Code §95.1(b) so as to allow some degradation of Silver Creek. It remanded to DER, directing "that the permits [be] remanded to the Department of Environmental Resources for reevaluation of the effluent limitations consistent with the foregoing opinion." (Board order dated October 26, 1987.) In its appeal of that order,[5] DER raises two issues for our review: 1) whether Big B affirmatively demonstrated that the proposed degradation of Silver Creek was justified as the result of necessary economic development which is of significant public value; and 2) whether Big B affirmatively demonstrated that all present and possible uses of Silver Creek would be protected if the water quality of Silver Creek were degraded.

---

[5] This Court, *sua sponte,* raised the issue of whether this was a final, appealable order. In a memorandum opinion filed January 29, 1988, we concluded that it was in that the order finally determined the issue of whether Big B had proven compliance with subsections (1) and (2) of 25 Pa. Code §95.1(b), thereby allowing the discharge of pollutants into Silver Creek.

We must begin our analysis of these issues cognizant of our limited scope of review of a Board order: we must affirm unless we determine that constitutional rights have been violated, an error of law has been committed, or that necessary factual findings are not supported by substantial competent evidence. Section 704 of the Administrative Agency Law, 2 Pa. C. S. §704; *Pennsylvania Game Commission v. Department of Environmental Resources*, 97 Pa. Commonwealth Ct. 78, 509 A.2d 877 (1986) *petition for allowance of appeal granted*, 513 Pa. 643, 521 A.2d 934 (1987). The Court *en banc* in *Pennsylvania Game Commission* summarized other relevant factors we must consider:

> When we review an administrative order, the prevailing party is entitled to the benefit of every inference which can be logically drawn from the evidence when viewed in a light most favorable to the prevailing party. Doerr v. Pennsylvania Liquor Control Board, 88 Pa. Commonwealth Ct. 610, 614, 491 A.2d 299, 302 (1985). Questions of resolving conflicts in the evidence, witness credibility, and evidentiary weight are properly within the exclusive discretion of the factfinding agency, and are not usually matters for a reviewing court. Chapman v. Pennsylvania Board of Probation and Parole, 86 Pa. Commonwealth Ct. 49, 484 A.2d 413 (1984). An administrative agency has wide discretion when establishing rules, regulations, and standards, and also in the performance of its administrative duties and functions, and this Court cannot overturn an agency's exercise of its discretion absent proof of fraud, bad faith, or blatant abuse of discretion. Wengrzyn v. Cohen,

92 Pa. Commonwealth Ct. 154, 158, 498 A.2d 61, 62 (1985).

*Id.* at 82, 509 A.2d at 880. Finally, "the Board, of course, is clearly empowered to substitute its discretion for that of the DER." *Marcon, Inc. v. Department of Environmental Resources,* 76 Pa. Commonwealth Ct. 56, 59, 462 A.2d 969, 971 (1983).

Turning to DER's first argument, that Big B did not affirmatively demonstrate that its mining activity and the resultant discharges were justified as a result of necessary economic or social development[6] of significant public value, we note that DER has not questioned the Board's factual findings, but, rather, the conclusions which it draws from these findings.

As its starting point, DER decries the Board's abandonment of its prior interpretation of the language of 25 Pa. Code §95.1(b). Before taking testimony in this case, the Board directed Big B to file a memorandum of law on the issues of the elements of proof required of it under the regulation and what evidence would be germane to the inquiry. The Board then issued an opinion and order in which it discussed the interpretation of the regulation which it would use for purposes of determining the admissibility of evidence at the hearing. The adjudication and order now before us, issued on the merits following eight days of testimony, is at variance with the Board's original interpretation. DER has cited no authority in support of its position that the Board's provisional opinion was somehow binding on the Board in its ultimate resolution of the issues before it. Rather, DER asks this Court to substitute its discretion for that of the Board in this instance because Member Roth, the sole Board member

---

[6] Big B has never contended that its mining activity would be of any social value. Accordingly, our review will focus upon the question of economic development, as did the Board's.

adjudicating the case, has no formal legal training and, presumably, misapprehended the "correct" interpretation of the regulation. We decline to depart from our well settled scope of review.[7] *See Pennsylvania Game Commission; Marcon.*

Both parties acknowledge that the burden of proof in this case was upon Big B. DER argues that Big B failed to sustain that burden based upon DER's interpretation of the language of the regulation. The essential flaw in that argument is that it is the interpretation of the Board, not DER, which is relevant. *See Marcon.* We must determine whether the Board abused its discretion in adopting its interpretation of the regulation. In so doing, we are mindful that we must not substitute judicial discretion for administrative discretion in cases involving technical matters within the special knowledge and competence of the Board. *Pennsylvania Game Commission.*

Specifically with respect to the first criterion of 25 Pa. Code §95.1(b)(1), DER argues that the Board erred in several respects. It breaks down the phrase "necessary economic . . . development which is of significant public value" into its various component parts. Its argument, very briefly summarized, is that: 1) the proposed mining is not "necessary" because there is no public need or, if there is a need, it can be satisfied by other means; and 2) the "economic development" is not of "significant" (read, unquestionably important) "public value" to the local population because the economic benefits must be balanced against the environmental harm.

---

[7] We can find no requirement that a Board member be an attorney. *See* the definition of the Board found in 25 Pa. Code §21.2. Further, as DER concedes, the parties here consented to the adjudication by Member Roth alone where it was impossible for the Board to comply with the provisions of 25 Pa. Code §21.86(a) requiring a majority vote of the Board on final decisions.

DER argues that Big B did not show a public need, which it defines in terms of the local population, for its coal because, even though the evidence indicated that Big B's tract contains coal of high quality, it is in no way scarce or unique as similar coals exist in the region which could be mined without affecting the Silver Creek watershed. Further, the evidence indicated that Big B anticipated that the bulk of its coal sales would be to Canada, so that the local public would not reap the economic benefits of its use. The Board viewed the regulation differently. Recognizing that it was dealing with an energy source and not some luxury item, it defined "need" in terms of market price, reasoning that need was established by virtue of the fact that the public (which the Board defined in a broad, marketwide sense) was willing to pay a fair price for a quality commodity. We cannot say that this is an unreasonable interpretation, despite DER's assertions to the contrary.

That there are other sources of coal available on other parcels of land does not affect this analysis. The inquiry under the regulation is whether the "proposed" discharge is justified, not whether one can envision another activity that could fill the same need with a less significant environmental impact. DER's argument that the economic development must be balanced against the environmental impact bespeaks a similar flaw. In both assertions, DER is attempting to have this Court read additional elements into its own regulation in order to strengthen its language. The fact that we recognize DER's good intentions to protect the environment does not render its argument appropriate in this appeal, where we are concerned with determining whether the Board's interpretation of the regulation, as written, is a reasonable one.

In determining that Big B's mining would result in economic development of significant public value, the

Board considered the revenues which would be generated by the mining. The Board concluded that a large portion of these revenues would enter the stream of public commerce in Butler County via: revenues to Big B and the owners of the coal leases; income to the miners employed by Big B; and expenditures by Big B, including the payment of taxes and the purchase of fuels, equipment and supplies. Again, giving Big B the benefit of all logical inferences from the evidence as *Pennsylvania Game Commission* requires, and recognizing that it is the Board's role to weigh the evidence, *id.*, we are unable to conclude that the Board has abused its discretion in relying on this evidence to reach its conclusion that the mining here is of significant public value.

As noted above, the regulation itself contains no test to balance economic development against environmental harm such as that urged by DER. The Board concluded that the second prong of the regulation, 25 Pa. Code §95.1(b)(2), was designed to consider the environmental impact apart from the aspect of economic development. Noting that an applicant to degrade a high quality stream must comply with both of the regulation's criteria, the Board then went on to separately study whether any "presently possible" uses of the stream would be precluded. From our reading of the express language of the regulation, we can discern no error in this approach.

DER's next argument, that Big B did not demonstrate. that "all present and possible" (Brief p. 49) uses of Silver Creek would be protected, is initially flawed in that it is again attempting to supplement the language of the regulation. 25 Pa. Code §95.1(b)(2), as set forth above, requires that "proposed . . . discharges . . . will not preclude any use *presently possible*." (Emphasis added.) "Present and possible" obviously connotes a broader concept than "presently possible."

DER asserts that Big B failed to meet its burden of proof because it did not conclusively prove that: 1) trout reproduction would continue after its mining; 2) that its pollution control measures were adequate; and 3) despite Big B's prior good record as demonstrated by the fact that native trout exist in UT#2 post-mining, it presented no "hard" evidence to compare the Fleming and Gould site operations. What DER is essentially asking this Court to do is re-weigh the evidence, which, of course, we may not do. *Pennsylvania Game Commission*.

The Board carefully analyzed the evidence before it to determine whether Big B's proposed discharges would preclude trout reproduction, which DER itself characterizes as "unquestionably Silver Creek's most important protected use." (Brief p. 49.) The evidence indicated that a clean, gravelly substrate is necessary for trout reproduction, and that excessive siltation will adversely affect reproduction. As DER admits, the precise calculation of how much siltation a stream can support before a reproductive habitat is ruined is not known.

Big B proceeded on the theory that it could demonstrate that its past operations at the Fleming site had not adversely affected the uses of Silver Creek. The Board considered this evidence persuasive. For example, it noted that the portion of Silver Creek above the Walley Mill bridge, into which UT#2 flows, was upgraded to exceptional value waters after Big B had concluded its mining operations. Further, it considered testimony relating to Big B's compliance with the terms of its previous permit and its successful use of erosion and sedimentation (E&S) controls. The Board balanced this testimony against that presented by DER concerning the dangers of siltation to trout reproduction and the inadequacy of E&S controls generally. The Board summarized its resolution of the conflicts in the evidence as follows:

> Essentially, our choice is between DER's worst case assumption, i.e., that the E&S controls are likely to fail, and Big B's demonstrated record at the Fleming site. In the absence of hard quantitative data or even estimates of impact, we believe that Big B's operational record in connection with the efficiency of its E&S controls is a stronger factor tha[n] DER's conjecture of failure. We therefore conclude that Big B has met its burden of proof with regard to showing that the uses of Silver Creek can be maintained while it mines the Gould site.

(Board Adjudication p. 50.) From that summary, we cannot conclude that the Board abused its discretion. Particularly given the technical nature of the evidence presented, we would be loathe to engage in our own evaluation of it, and must defer to the Board's expertise.

One final point is worthy of mention. DER contends that Big B did not meet its burden of demonstrating that *all* possible uses of the stream would be protected, and that the Board did not consider what the other possible uses might be. First of all, we note that DER originally denied Big B's permit on the basis of 25 Pa. Code §95.1(b)(1), for failure to demonstrate economic development of significant public value. While we certainly agree that both criteria under the regulation must be met in order to justify some degradation, we do not believe that an applicant is therefore required to anticipate and enumerate all possible uses of a watercourse, except those which may be reasonably anticipated to be affected by the discharge at issue. DER has offered no examples of any other uses of Silver Creek which it believes would be affected by the siltation and common sense precludes us from engaging in such a guessing game at this stage of the litigation.

For the foregoing reasons, we affirm the order of the Board.

ORDER

AND NOW, this 23rd day of February, 1989, the order of the Environmental Hearing Board in the above-captioned matter is hereby affirmed.