Sunoco Partners Marketing and    :
Terminals, L.P.,                      :
                    Petitioner     :
                                :
           v.                   :
                                :
Clean Air Council and Commonwealth  :
of Pennsylvania, Department of     :
Environmental Protection,        :   No. 145 C.D. 2019
               Respondents   :   Argued:  September 9, 2019

BEFORE:   HONORABLE ANNE E. COVEY, Judge
               HONORABLE MICHAEL H. WOJCIK, Judge
               HONORABLE ROBERT SIMPSON, Senior Judge

OPINION BY
JUDGE COVEY                     FILED:  October 1, 2019

Sunoco Partners Marketing and Terminals, L.P. (Sunoco) petitions this Court for review of the Commonwealth of Pennsylvania (Pennsylvania) Environmental Hearing Board's (EHB) January 9, 2019 Adjudication remanding Plan Approval No. 23-0119E (Plan Approval E)[1] to the Pennsylvania Department of Environmental Protection (DEP) for further consideration.  Sunoco presents three issues for this Court's review: (1) whether the Court has jurisdiction over this interlocutory appeal pursuant to Pennsylvania Rule of Appellate Procedure (Rule) 311(f); (2) whether, after combining and treating emissions from Projects 1, A, B, C, D and E  as a single project, the EHB violated the administrative finality doctrine by

---

[1] A plan approval is a permit that authorizes a permittee to construct, assemble, install and/or modify and operate an air contamination emissions source. *See* Section 6.1 of Pennsylvania's Air Pollution Control Act, Act of January 8, 1960, P.L. (1959) 2119, *as amended*, added by Section 6 of the Act of October 26, 1972, P.L. 989, 35 P.S. § 4006.1; *see also* Section 127.11 of the Pennsylvania Department of Environmental Protection's Regulations, 25 Pa. Code § 127.11; DEP Br. at 7.

ordering DEP to reevaluate the applicability of federal air quality program requirements; and (3) whether the EHB violated the administrative finality doctrine by ordering DEP to consider combining Plan Approval E emissions with Plan Approvals F, G, H and I (collectively, Post-Dated Plan Approvals).

## Background

Sunoco is a limited partnership that owns and operates a terminal facility at the Marcus Hook Industrial Complex (Facility) located in Marcus Hook Borough, Delaware County, Pennsylvania, pursuant to Title V Operating Permit No. 23-0119.[2] Sunoco, Inc. operated a crude oil refinery at the Facility until 2011. Sunoco Logistics purchased the Facility from Sunoco, Inc.[3] *See* EHB Adj. Finding of Fact (FOF) 7.

The Facility contains several stationary air contamination emissions sources regulated by the federal Clean Air Act (CAA)[4] and Pennsylvania's Air Pollution Control Act (APCA).

> The CAA was enacted to, among other things, 'protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population.' 42 U.S.C. [§] 7401(b)(1). To achieve this goal, Congress instructed the United States Environmental Protection Agency (EPA) to develop limits on the maximum concentrations of various pollutants allowable in different areas of the country known as National Ambient Air Quality Standards (NAAQS). 42 U.S.C. [§] 7409(a)(1)(A). An area could be in compliance or in 'attainment' with NAAQS for some pollutants while

---

[2] A "Title V operating permit is an air permit for large facilities that have potential emissions greater than a major source threshold." Certified Record, Notes of Testimony (N.T.) at 730.

[3] Sunoco is a division of Sunoco Logistics, and is a separate legal entity from Sunoco, Inc. *See* EHB Adj. Finding of Fact 7.

[4] 42 U.S.C. §§ 7401-7671q. The Facility "also includes air contaminant sources located at Sunoco's facility in the state of Delaware (permitted under Title V Operating Permit No. AQM-003/00021)[.]" EHB Adj. at 46; *see also* EHB Adj. FOFs 142, 153, 187; N.T. at 516-517.

not in compliance or in 'nonattainment' for other pollutants. Sources in an area in attainment were subject to the Prevention of Significant Deterioration (PSD)[5] requirements while sources in an area in nonattainment were subject to the New Source Review (NSR)[6] requirements. To enforce NAAQS, the CAA employed a system of cooperative federalism requiring states to create a state implementation plan (SIP) 'provid[ing] for implementation, maintenance, and enforcement' of the NAAQS. 42 U.S.C. [§] 7410(a)(1).

The EPA approved Pennsylvania's SIP which required the issuance of a plan approval before construction could begin on any new source of air contamination. 25 Pa. Code § 127.11.[FN2] The SIP adopted NSR regulations for [] DEP to implement requiring, *inter alia*, a facility to comply with the Lowest Achievable Emission Rate (LAER) for pollutant emissions in nonattainment areas. It incorporated the federal PSD permit regulations to serve as Pennsylvania's regulations[,] except that [] DEP was primarily the agency with authority for an area in attainment. 25 Pa. Code § 127.83. The PSD regulations established allowable increments for pollutants, which was the amount of additional pollution that could be safely added to an area by new or existing sources without endangering that area's attainment status. . . . Additionally, the general public was required to receive notice and an opportunity to comment on any proposed plan approval.

> [FN2] Pennsylvania enacted the [APCA] . . . to protect, among other things, the Commonwealth's air resources for the protection of public health, safety and well-being of its citizens and for the development, attraction and expansion of industry, commerce and agriculture. Under Section[] 5(a)(1) and (8) of the APCA, 35 P.S. §[] 4005(a)(1) and (8),

---

[5] "PSD regulations apply to the construction of any new major stationary source, or any major modification of any existing stationary source in an area designated as attainment or unclassifiable." EHB Adj. FOF 21; *see also* 25 Pa. Code §§ 127.81-127.83. Pennsylvania references and incorporates the federal PSD regulations. *See* EHB Adj. FOFs 21-22.

[6] "NSR is a regulation for nonattainment areas for major sources of nitrogen oxide (NOx), volatile organic compounds (VOCs), and particulate matter with a diameter less than 2.5 micrometers (PM 2.5)." EHB Adj. FOF 17; *see also* 25 Pa. Code §§ 127.201-127.218. In Pennsylvania, NSR "generally refers to what in the [Code of Federal Regulations] is known as Nonattainment New Source Review ('NNSR')." EHB Adj. FOF 16 n.1; *see also* N.T. at 456.

> it assigned responsibility to the Environmental Quality Board [(EQB)] to adopt rules and regulations for the prevention, control, reduction and abatement of air pollution and for the implementation of the CAA.[7]

*Groce v. Dep't of Envtl. Prot.*, 921 A.2d 567, 571-72 (Pa. Cmwlth. 2007). Due to its location in Delaware County, the Facility's emissions sources are subject to PSD and NSR requirements.[8] *See* EHB Adj. FOF 16.

Sunoco is currently repurposing the Facility from a refinery to a location to process (*i.e.*, fractionate) and store natural gas liquids (NGLs) received from the Mariner East pipeline for eventual redistribution and marketing.[9] Since 2012, Sunoco has adapted and repurposed parts of the Facility related to NGL processing through Projects 1 (SXL Project Mariner), A (SXL Project Mariner – Deethanizer), B (SXL Natural Gasoline Project), C (SXL Project Mariner – Cooling Tower), D (SXL New

---

[7] The EHB and [DEP] are two branches of the tripartite administrative structure that governs environmental regulation in Pennsylvania. The third branch of that structure is the [EQB]. [DEP] is the executive branch, assigned various duties to implement and enforce environmental statutes and regulations. *See, e.g.*, Section 4 of the [APCA], . . . 35 P.S. § 4004. The EHB is the judicial branch, empowered to hold hearings and issue adjudications on orders, permits, licenses or decisions of [DEP]. Section 4 of the Environmental Hearing Board Act (EHB Act), Act of July 13, 1988, P.L. 530, 35 P.S. § 7514. Section 3(a) of the EHB Act, 35 P.S. § 7513(a), describes the EHB as 'an independent quasi-judicial agency.' The EQB is the legislative branch, responsible for developing a master environmental plan for Pennsylvania and empowered to formulate, adopt and promulgate rules and regulations for [DEP]. It is comprised of representatives from a plethora of organizations, including representatives from [DEP].

*Dep't of Envtl. Prot. v. N. Am. Refractories Co.*, 791 A.2d 461, 462 (Pa. Cmwlth. 2002).

[8] The Facility is considered a major stationary source for PSD and NSR. *See* EHB Adj. FOF 26; *see also* N.T. at 669, 735, 744.

[9] NGL fractionation is the process of separating out various component products from the mixed liquids, including ethane, propane, butane and pentane. *See* EHB Adj. FOFs 6, 11.

Tanks Project), E (ETP Project Revolution and SXL Depropanizer Project), F, G, H and I (ME2X Project). *See* EHB Adj. FOFs 43, 60, 79, 114, 138, 167, 242-243.

Pursuant to Section 6.1 of the APCA, 35 P.S. § 4006.1, and Section 127.11 of DEP's Regulations, 25 Pa. Code § 127.11, Sunoco sought and obtained from DEP Requests for Determination (RFD) 5236 and 5597,[10] and DEP plan approvals[11] to construct, install and/or modify emissions sources[12] for each of the projects, including Plan Approval E (issued April 1, 2016).

In accordance with Section 127.12 of DEP's Regulations, 25 Pa. Code § 127.12, Sunoco had to specify in its plan approval applications, *inter alia*, the pollutants an emissions source will emit, how much of each pollutant it expects to emit, the air pollution control equipment to be used, operating specifications and emissions limits. *See* DEP Br. at 7.

---

[10] An RFD "is a request by a company to determine whether a[] . . . plan approval is needed for a particular project." Sunoco Br. App. A (EHB Adj.) ¶ 238. For RFD 5236 (issued August 13, 2015; Reproduced Record (R.R.) at 339a-352a), DEP "indicat[ed] that a plan approval was not required for the proposed work [(i.e., installation of two 50,000 barrel spheres for propane and butane storage)]." EHB Adj. FOF 240; *see also* Sunoco Br. at 9. For RFD 5597 (issued April 11, 2016; R.R. at 353a-359a), DEP determined that no plan approval was needed for Sunoco to transfer the instrument air compressor cooling loads from the 15-6 cooling tower to the 15-2B cooling tower. *See* R.R. at 359a; *see also* R.R. at 59a.

[11] Sunoco's plan approvals were correspondingly called Plan Approval 1 (issued February 5, 2013; R.R. at 77a-115a), Plan Approval A (issued September 5, 2013; R.R. at 116a-134a), Plan Approval B (issued January 30, 2014; R.R. at 135a-221a), Plan Approval C (issued November 19, 2014; R.R. at 222a-238a), Plan Approval D (issued February 6, 2015; R.R. at 239a-279a), Plan Approval E (issued April 1, 2016; R.R. at 11a-48a), Plan Approval F (issued August 15, 2016; R.R. at 284a-302a), Plan Approval G (issued March 10, 2017; R.R. at 303a-320a), Plan Approval H (issued April 13, 2018; R.R. at 321a-338a) and Plan Approval I (pending/withdrawn). *See* Sunoco Br. at 8-9; *see also* CAC Br. at 3.

[12] Emissions sources include new sources (for which calculations are based on potential emissions), modified sources (for which baseline emissions are subtracted from actual emissions) and existing unmodified sources (for which only the increases attributable to the project are calculated). *See* N.T. at 736-737, 752. "Baseline actual emissions are the average actual emissions over a 24-consecutive-month period as supplied by the . . . applicant[,]" which DEP then verifies were emitted and reported. N.T. at 737-738.

"[B]efore [] DEP may issue a plan approval for a source subject to PSD review, the owner or operator of the proposed source must demonstrate that allowable emission increases would not 'cause or contribute' to air pollution in violation of the NAAQS or the allowable increment." *Groce*, 921 A.2d at 577 (footnote omitted). DEP explained at the EHB hearings and in its brief to this Court:[13]

> As part of its review of a plan approval application, DEP examines the plan approvals a facility has received recently, the projects it has installed or modified recently, as well as the projects it may be constructing in the near future. DEP examines the permitting of projects in the past and the potential ones in the future to determine if any of the past or future projects at the facility should be combined, or aggregated, and treated as one project to prevent circumvention of the permitting requirements.
>
> If DEP determines that the project described in a current application should be considered part of an existing project permitted in an earlier plan approval, it will combine the emissions from the existing project with the emissions from the current application to determine whether NSR or PSD apply to the current project.
>
> The question of whether a current application for a plan approval is really part of a project authorized in a previously[]issued plan approval is **a factual determination** that affects only the current permit and has no impact on the prior one. DEP does not reopen or change any of the previously issued plan approvals. If DEP determines that the current project is part of a larger project the company is planning to construct in the future, it will combine the emissions from the current project with the estimated emissions from the future portion of the overall project. Once DEP determines that the application is complete and **performs its technical review**, it has the authority to issue a plan approval **with the conditions it deems necessary** to assure the proper operation of a source. 25 Pa. Code § 127.12b.

---

[13] Neither Sunoco nor Clean Air Council dispute DEP's description.

DEP Br. at 7-8 (emphasis added; record citations omitted); *see also* Sunoco Br. at 6; Clean Air Council (CAC) Br. at 3; N.T. at 258, 335, 337, 386-387, 451-454, 542-543, 732, 859-860; *see also* EHB Adj. FOFs 31-33, 276, 277.

Relative to Plan Approval E at issue in this appeal, DEP concluded based on Sunoco's application that there were no modified sources associated with the proposed work, it was not linked[14] to Plan Approvals 1, A, B, C or D, and it did not alone trigger PSD significance thresholds. *See* EHB Adj. FOFs 216, 226-230, 234, 236. DEP did not determine whether the aggregated emissions from the linked projects would trigger PSD or NSR significance thresholds. *See* EHB Adj. FOF 237; *see also* Certified Record, Notes of Testimony (N.T.) at 382-383, 521-522. Plan Approval E was published in the *Pennsylvania Bulletin* on April 16, 2016.[15]

On April 29, 2016, CAC, a Philadelphia, Pennsylvania-based citizen action group, appealed from DEP's Plan Approval E decision to the EHB, claiming that DEP erred by (1) treating Project E as a stand-alone project for PSD and NSR applicability purposes; and (2) determining which Project E emission units were modified and undercounting the emissions increases associated therewith, thereby allowing Sunoco to avoid PSD and NSR requirements. CAC did not previously

---

[14] "[DEP] used the term 'linked' to refer to whether two or more projects are technically or economically connected to each other and whether the emissions resulting from all of the work associated with the projects should be added up to determine whether NSR or PSD requirements are triggered." EHB Adj. FOF 77.

[15] Section 1021.52(a)(2)(i) of DEP's Regulations mandates that persons aggrieved by DEP actions have 30 days after the action is published in the *Pennsylvania Bulletin* to appeal to the EHB. *See* 25 Pa. Code § 1021.52(a)(2)(i). "Pursuant to [Section 4(c) of] the [EHB Act], 35 P.S. § 7514(c), the failure to appeal within [30] days render[s] DEP's action final." *Dep't of Envtl. Prot. v. Cromwell Twp., Huntingdon Cty.*, 32 A.3d 639, 652-53 (Pa. 2011).

Notably, "[t]he EHB is not an appellate body with a limited scope of review . . . . Rather, the EHB's duty is to determine if DEP's action can be sustained or supported by the evidence taken by the EHB." *Pa. Trout v. Dep't of Envtl. Prot.*, 863 A.2d 93, 106 (Pa. Cmwlth. 2004). Thus, "when an appeal is taken from DEP to the EHB, the EHB is required to conduct a hearing *de novo*." *Id.*

appeal from Plan Approvals 1, A, B, C, D or RFD 5236.[16] *See* EHB Adj. FOFs 163, 240, 242, 244. The EHB conducted hearings on CAC's appeal on May 7, 8, 9 and 10, 2018.

On January 9, 2019, the EHB issued the Adjudication, therein concluding that Projects 1, A, B, C, D, E and RFD 5236 constituted a single project (Project 1/A/B/C/D/E) for purposes of determining PSD/NSR applicability and, thus, DEP erred by issuing Plan Approval E without aggregating its emissions with those of Sunoco's former Projects 1, A, B, C, D, now-known as Post-Dated Plan Approvals. Rather than revoking Plan Approval E, the EHB remanded it to DEP for further consideration, subject to the following constraints:

> (1) the emissions from Projects 1 through E must be aggregated as part of the new applicability determination for Plan Approval E, and (2) [DEP] must consider whether the now-known [Post-Dated Plan Approvals] should also be aggregated with the Project E emissions as part of the new applicability determination for Plan Approval E.

EHB Adj. at 74. On February 8, 2019, Sunoco appealed to this Court.[17]

On February 14, 2019, CAC filed an Application to Quash Sunoco's appeal as interlocutory (Quashal Application). On February 14, 2019, this Court ordered the parties to address the appealability of the EHB's interlocutory order under Rule 311(f) in their principal briefs on the merits. On March 4, 2019, Sunoco opposed CAC's Quashal Application.

---

[16] CAC appealed from Plan Approval H on May 25, 2018. *See* Sunoco Br. at 9.

[17]    Our appellate review of the [EHB's] adjudications is limited to determining whether the [EHB] committed an error of law, [whether it] violated constitutional rights, or whether its material findings of fact are supported by substantial evidence. On issues of law, our standard of review is *de novo* and our scope of review is plenary.

*EQT Prod. Co. v. Dep't of Envtl. Prot.*, 193 A.3d 1137, 1148 (Pa. Cmwlth. 2018) (citations omitted).

## Discussion

### 1. Rule 311(f)

Preliminarily, this Court must determine whether it has jurisdiction over this interlocutory appeal. Rule 341(a) provides, in relevant part, that "an appeal may be taken as of right from any final order of a government unit . . . ." Pa.R.A.P. 341(a). Rule 341(b) specifies that "[a] final order is any order that . . . (1) disposes of all claims and of all parties; or . . . (3) is entered as a final order pursuant to paragraph (c) of this rule [(relating to orders granting interlocutory review of particular issues)]." Pa.R.A.P. 341(b). Essentially, Rule 341(b) "limits [an] appeal to those orders that essentially dispose of the entire case, unless the [administrative agency] specifically orders otherwise." *Cent. Dauphin Sch. Dist. v. Cent. Dauphin Educ. Ass'n*, 739 A.2d 1164, 1167 n.4 (Pa. Cmwlth. 1999). Otherwise, the order is interlocutory and generally not immediately appealable. *See In re Dauphin Cty. Fourth Investigating Grand Jury*, 943 A.2d 929 (Pa. 2007); *see also Peterson v. Workers' Comp. Appeal Bd. (Wal Mart, CMI, Inc.)*, 938 A.2d 512 (Pa. Cmwlth. 2007); *Commonwealth v. Fleming*, 794 A.2d 385 (Pa. Super. 2002).

This Court has ruled that "[an] . . . order remanding a matter . . . for further proceeding is an unappealable interlocutory order unless it falls within one of the exceptions set forth in [Rule] 311(f)." *Peterson*, 938 A.2d at 515. Rule 311(f) provides:

> **An appeal may be taken as of right from**: (1) **an order** of a . . . government unit remanding a matter to an administrative agency . . . for execution of the adjudication of the reviewing tribunal in a manner **that does not require the exercise of administrative discretion**; **or** (2) **an order** of a . . . government unit remanding a matter to an administrative agency . . . **that decides an issue that would ultimately evade appellate review** if an immediate appeal is not allowed.

9

Pa.R.A.P. 311(f) (emphasis added).

Here, the EHB's Adjudication did not dispose of all claims or expressly allow for interlocutory review, and the parties do not dispute that the EHB's January 9, 2019 Adjudication remanding this matter to DEP was not a final order. *See* Sunoco's Petition for Review ¶ 3.

### a. Rule 311(f)(1) - Administrative Discretion

Sunoco argues that this Court has jurisdiction pursuant to Rule 311(f)(1). The EHB directs on remand that:

> (1) **the emissions from Projects 1 through E** *must be aggregated* as part of the new applicability determination for Plan Approval E, **and** (2) [**DEP**] *must consider whether the* [**Post-Dated Plan Approvals**] **should also be aggregated** with the Project E emissions as part of the new applicability determination for Plan Approval E.

EHB Adj. at 74 (bold and italics emphasis added).

Sunoco claims that since the EHB directed that DEP *must* aggregate Project E emissions with Projects 1, A, B, C and D and RFD 5236, DEP lacks administrative discretion and, thus, this appeal is authorized pursuant to Rule 311(f)(1). CAC asserts that "the authority for an appeal under [Rule] 311(f)(1) does not apply because the EHB has explicitly left for [DEP] a complex and technical application of law under the [CAA]." CAC Br. at 5. DEP similarly retorts that DEP's evaluation on remand does not meet the Rule 311(f)(1) criteria because it necessarily involves administrative discretion, since the EHB instructed DEP to combine the emissions, but did not specify how it should do so, and because PSD and NSR application is complex and fact-specific. *See* DEP Br. at 11.

DEP Air Pollution Control Engineer and Air Quality Permit Reviewer George Eckert (Eckert) reviewed Sunoco's plan approvals and RFDs, and conducted

pre-application meetings with Sunoco representatives. *See* N.T. at 337, 391-392, 423, 451, 476-477, 543. He described at the EHB hearings that Sunoco's plan approvals and RFDs were also reviewed and approved by DEP's Environmental Engineer Manager/Chief of DEP's Facilities Air Quality Permit Section Janine Tulloch-Reid (Tulloch-Reid) and further by DEP's Regional Air Quality Program Manager James Rebarchak (Rebarchak). *See* N.T. at 732-733, 743.

Eckert explained that, after he reviews a plan approval application for completeness, he examines its contents, consults applicable regulations and prepares a review memo that outlines his analysis. Eckert stated that, as part of his review, he verifies and confirms the applicant's calculations. *See* N.T. at 733.

Eckert declared that he conducts NSR and PSD applicability determinations for every Title V facility plan approval, including Sunoco's projects at the Facility. *See* N.T. at 736, 741. NSR applicability determinations require that Eckert "look at the increases from [all emissions sources affected by] the project and [] combine[s] those increases with increases over the previous five calendar years. And if necessary, . . . [he] combine[s] the increases from the project with any increases and decreases over the previous 10-year period." N.T. at 736. Eckert asserted that he "not only look[s] at the years that [the applicant] submit[s], but [] also look[s] at a few years ahead of that, as well as a few years behind that . . . [to] try to find out if any of the sources that are included in those emissions have changed and why." N.T. at 738.

Eckert testified that the consequences for triggering NSR are that the applicant "would be subject to emission reduction credits and the new and modified sources would be subject to LAER." N.T. at 739. He described that "LAER can change. Sometimes [the EPA LAER clearinghouse changes] . . . between the submittal of the application and when [DEP] issues the plan approval." N.T. at 739.

11

Thus, Eckert checks LAER during his initial application review and again before DEP issues the plan approval. *See* N.T. at 740.

Eckert related that the PSD applicability determination involves a two-step process:

> The first step is looking solely at the emissions attributable to the process itself. If that answer for each pollutant is less than the significant level for the respected pollutant, then the analysis ends. If one or more of those exceeds a significant level, then [] step two . . . takes the analysis from step one and combines it with any increases and decreases over the previous 10-year period.

N.T. at 741-742. Among the consequences of triggering PSD, Eckert recalled that the applicant must determine how to control the pollutant's emissions by best available control technology (BACT). *See* N.T. at 742-743.

Eckert specifically recalled relative to his Project E review that he "needed to understand the sources which were new, which were modified, [and] which were existing and not modified. [He] needed to understand any regulations that might be applicable to those. [He] needed to know if anything was being changed or affected by this project." N.T. at 751. In the process, Eckert reviewed and verified Sunoco's emissions calculations. *See* N.T. at 751-752. Eckert also disclosed that, after discovering he had deemed an unmodified source modified in his Plan Approval E review memo, he issued a revised review memo. *See* N.T. at 534-535, 759-760; *see also* N.T. CAC Exs. A-22, A-23.

Tulloch-Reid testified that, when reviewing a project for plan approval, DEP assesses:

> How does it affect your other sources that you have at the facility? Are there any changes that are occurring at those other sources[?] Is it interdependent on each other? Do you have any other future plans? Do you need to make those known up front, . . . so we can address those and look at the emission on whole[?]

N.T. at 545.  Tulloch-Reid explained that Eckert revised his Plan Approval E review memo after she and Eckert

> went back and looked at the definitions for modification according to the regulations.  And we made sure to make all the checkpoints.
>
> Is there a physical change?  Is there a change in the operation o[r] was there an increase in the operation?  Was modification due to maintenance or routine repair or was there any omission?
>
> We also went further and looked at what the federal definition is.  And that also had another additional checkpoint to look at increase in -- or rates that do not exceed their limits in their existing permit.  We looked at all of those.  Then because we went back and evaluated all those points, . . . we made our determination that some of the sources were existing on modified sources.

N.T. at 536.  Tulloch-Reid stated that they re-examined Project E to "mak[e] sure that [DEP's] judgment call [was] correct."  N.T. at 535.

Notably, CAC objected to DEP's issuance of Plan Approval E on the following grounds:

> 1. [**DEP**] **miscalculated** the emissions increase from the project in its [NSR] analysis **by accepting past potential emissions**, rather than past actual emissions, as baseline actual emissions.
>
> 2. [**DEP**] **miscalculated** the level of future emissions of [VOCs] from the cooling tower, **leading** [**DEP**] **to require fewer tons of VOC emissions reduction credits to be retired** than it should have.
>
> 3. [**DEP**] **miscalculated the emissions increase from the** project with respect to the **flare**.
>
> 4. [**DEP**] **miscalculated** the fugitive emissions increase from new piping components **by using the 'actual to projected actual' test** rather than the 'actual to potential' test, in violation of [Section 127.203a(a)(1)(i)(B) of DEP's Regulations,] 25 Pa. Code § 127.203a(a)(1)(i)(B).

13

5. [**DEP**] **miscalculated** the fugitive emissions increase from both new and existing piping components **by failing to take into account the higher-than-anticipated Reid vapor pressure**[18] of the product feedstock that would move through the piping, as acknowledged by Sunoco in its application for [P]lan [A]pproval [F].

6. [**DEP**] **accepted Sunoco's design values** for emissions calculations **without requiring manufacturer specifications** or other documentation of the values, leaving the resulting projected emissions numbers unverified.

7. In violation of [Section 127.203a(a)(4)(1) of DEP's Regulations,] 25 Pa. Code § 127.203a(a)(4)(1), Sunoco used the baseline years 2009 and 2010 (more than five years before submission of the application) in calculating whether there will be a significant emissions increase from the project, without seeking or receiving a written determination from [DEP] that those years were more representative of normal source operation. Sunoco has chosen different baseline years for the same equipment across related plan approval applications, violating the principle in the above [DEP Regulation] provision that the baseline should be the most representative of normal source operation.

8. [**DEP**] **otherwise miscalculated** the emissions increase from the project **in its** [**NSR**] **analysis**.

9. [**DEP**] **wrongly accepted** Sunoco's division of its Marcus Hook Mariner East project into **multiple sub-projects**, allowing unlawful circumvention of [NSR] in violation of [Section 127.216 of DEP's Regulations,] 25 Pa. Code § 127.216.

10. In violation of [Section 127.205(2) of DEP's Regulations,] 25 Pa. Code § 127.205(2), Sunoco failed to provide information for the compliance certification for other facilities owned or operated by entities under common control with Sunoco.

11. [**DEP**] **erred in accepting as complete Sunoco's materially incomplete application**, which remains

---

[18] The term Reid vapor pressure is not defined in the record.

incomplete even after Sunoco's supplemental submissions to [DEP].

12. The *Pennsylvania Bulletin* notice for the proposed plan approval (a) **listed all the emissions as fugitive**, when most of them are not fugitive, (b) **did not include the boiler emissions**, (c) presented **miscalculated emissions numbers**, and (d) **presented the emissions tonnage as '[p]otential annual emissions**,' indicating that that tonnage reflected the sources' potential to emit, rather than correctly indicating that the tonnage reflected projected actual emissions. These failures render the notice in violation of [Section 127.45(b)(3) of DEP's Regulations,] 25 Pa. Code § 127.45(b)(3), which requires the notice to list the 'type and quantity of air contaminants being emitted.'

R.R. at 6a-8a (bold and italics emphasis added). In addition, DEP represents in its brief to this Court that "whether a current application for a plan approval is really part of a project authorized in a previously[]issued plan approval **is a factual determination**[.]" DEP Br. at 8 (emphasis added).

Even Sunoco recognizes in its brief to this Court that "the **EHB remanded Sunoco's permit specifically for** [**DEP**] **to use its expertise and discretion** to further investigate 'whether the now-known [Post-Dated Plan Approvals] should also be aggregated with the Project E emissions . . . .'" Sunoco Br. at 15 (quoting EHB Adj. at 74) (emphasis added). Sunoco further acknowledges in its Reply Brief: "[**DEP**] **will engage in new fact-finding** related to the aggregated Plan Approval 1/A/B/C/D/E." Sunoco Reply Br. at 19 (emphasis added).

Finally, "[t]he EHB determines from the evidence it receives whether DEP's action can be sustained. Where the EHB finds DEP abused its discretion, it may substitute its discretion for that of DEP and order the relief requested."[19]

---

[19] Congress and Pennsylvania's General Assembly have delegated to DEP the authority to determine whether Sunoco's operations at the Facility comply with federal and state regulations. *See Groce*. Accordingly, this Court has clarified that "[DEP], and not the EHB, is empowered to authoritatively interpret environmental regulations. That power is a necessary adjunct of [DEP's] authority to enforce environmental regulations. . . . [Therefore,] . . . [DEP's] interpretation of

15

*Leatherwood, Inc. v. Dep't of Envtl. Prot.*, 819 A.2d 604, 611 (Pa. Cmwlth. 2003); *see also Marcon, Inc. v. Dep't of Envtl. Res.*, 462 A.2d 969, 971 (Pa. Cmwlth. 1983) ("The [EHB] . . . is . . . empowered to substitute its discretion for that of [DEP].").

Here, the EHB expressed relative to modification:

[**DEP**] **may need to reconsider** on remand **what sources if any** have been 'modified' as that term is used in the PSD and NSR programs, and the consequences of any such modifications. Determining whether a source has been 'modified' is one of the most contentious parts of air pollution law and it is **complicated and highly fact-specific**. A modification is defined as follows:

*Modification* - A physical change in a source or a change in the method of operation of a source which would increase the amount of an air contaminant emitted by the source or which would result in the emission of an air contaminant not previously emitted, except that routine maintenance, repair and replacement are not considered physical changes. An increase in the hours of operation is not considered a modification if the increase in the hours of operation has been authorized in a way that is [f]ederally enforceable or legally and practicably enforceable by an operating permit condition.

25 Pa. Code § 121.1. . . . Not all modifications trigger [NSR]. For example, it depends in part upon whether there has been an increase in pollutant emissions from the project. 25 Pa. Code § 127.203a.

[**I**]**t is not entirely clear how** [**DEP**] **should address the modification** of emission units in a *post facto* project aggregation situation such as that presented here. . . . We believe [**DEP**] **should be afforded the opportunity to decide** in the first instance on remand how to address this problem.

EHB Adj. at 69-70 (emphasis added). The EHB acknowledged:

---

environmental regulations is entitled to great deference, unless [its] interpretation is clearly erroneous." *N. Am. Refractories Co.*, 791 A.2d at 466.

16

> [CAC] has raised a few issues that are likely to persist on remand. In determining whether an emissions unit has been modified, there is an open issue in a case like this (where multiple emission units are attached to each other), where one emission unit ends and a different emission unit begins. . . . Secondly, there is as [sic] an open issue of how emissions attributable to modified and unmodified sources need to be calculated for purposes of the PSD/NSR applicability determinations.

EHB Adj. at 70.

The EHB also specified that "[**DEP**] **will need to decide** on remand whether any of [the Post-Dated Plan Approval] construction work should be considered part of the same project that includes Project 1 through Project E for its revised applicability determination for Project E." EHB Adj. at 73 (emphasis added). The EHB further concluded:

> There does not appear to be any dispute that the **applicability determination for Project E must be redone by** Sunoco and [**DEP**] in the first instance in the event of a[n] [EHB] remand. No party has invited us to do the determination ourselves. Indeed, [CAC] argues repeatedly that it would be improper for us to do so. It acknowledges that Sunoco maintains some discretion in formulating the data used in a revised application, and it says **there is no one 'correct' set of NSR calculations**.
>
> At this point the parties' various predictions regarding what will happen on remand are just that: predictions. We will not attempt to add our own prediction to the mix, preferring instead that Sunoco and [**DEP**] **perform the proper analysis** in the first instance.

EHB Adj. at 74 (emphasis added). The EHB also held: "If at any point it becomes clear to [DEP] that extensive additional study will be needed because, e.g., PSD applies, **we will leave it to** [DEP] **to decide** in the first instance whether Plan Approval E should remain in place during that study." EHB Adj. at 75 (emphasis added).

Although the EHB could have decided that DEP abused its discretion relative to Plan Approval E, and substituted its own discretion and revoked Plan Approval E, the EHB acknowledged that the remanded issues were "complicated and highly fact-specific," EHB Adj. at 69, such that DEP should determine how to approach modification and potential application of the Post-Dated Plan Approval information.

It is clear based upon the applicable record evidence, including the subject plan approvals, review memos and the parties' representations, that EHB's order for DEP to aggregate the emissions from Projects 1 through E as part of a new Plan Approval E PSD/NSR applicability determination, and also to "consider whether" to include the Post-Dated Plan Approvals (not known at the time the prior approvals were issued), necessarily requires DEP to exercise discretion. EHB Adj. at 74. Although Sunoco supplied emissions source descriptions and emissions tables with its plan approval and RFD applications, *see* N.T. Sunoco Exs. 1-9, 19, 21, DEP's EHB-aggregated Plan Approval 1/A/B/C/D/E review will involve more than mere emissions calculations, particularly when considering whether and which Post-Dated Plan Approvals must be aggregated with Plan Approval 1/A/B/C/D/E. *See Sentinel Ridge Dev., LLC v. Dep't of Envtl. Prot.*, 2 A.3d 1263 (Pa. Cmwlth. 2010) (the EHB's remand for DEP to use its expertise and discretion to further investigate a proposed project's impact calls for more than a ministerial task); *see also City of Phila. v. Workers' Comp. Appeal Bd. (Mellon)*, 885 A.2d 640 (Pa. Cmwlth. 2005) (fact-finding necessary to determine the basis for a calculation involves administrative discretion). "Because [DEP's] determination[s] . . . will involve administrative discretion and [are] not a mere computation, [Sunoco's] appeal does not meet the requirements of [Rule] 311(f)(1) . . . ." *Id.* at 643. Therefore, the EHB's Adjudication is not appealable as of right under Rule 311(f)(1).

**b. Rule 311(f)(2) - Evade Review**

Sunoco argues that this Court has jurisdiction under Rule 311(f)(2) because the key issues – Plan Approval E's review in its initial scope (without aggregated emissions), and the applicability of the administrative finality doctrine – will evade review if this appeal is delayed until after remand. CAC contends that "the authority for an appeal under [Rule] 311(f)(2) does not apply because the [EHB] Act expressly provides for post-remand judicial review if Sunoco seeks it after a future determination." CAC Br. at 5. DEP asserts that the issues Sunoco raised will not evade review because Sunoco may appeal from DEP's action on the next Plan Approval E (which may be the same as the first one) and can raise any arguments about administrative finality then. *See* DEP Br. at 11, 16, 19.

According to Eckert, relative to Plan Approval E, DEP assessed whether Project E was linked to and, thus, should be aggregated with Projects 1 through D. He disclosed that, although DEP linked some of Sunoco's projects,[20] DEP determined that Projects 1 through D were independent of Project E and, thus, aggregation was not mandated. *See* EHB Adj. FOFs 226-231; *see also* N.T. at 347-351, 753-755. The EHB disagreed, and concluded that since "Projects 1 through E and RFD 5236 constitute a single project for purposes of [NSR] and [PSD]," EHB Adj. Conclusion of Law (COL) 8, "Project E should have been aggregated with Projects 1 through D and RFD 5236, and [DEP] erred when it issued Plan Approval E without aggregating it with Sunoco's former and known future projects at the [Facility]." EHB Adj. COL 9. Accordingly, the EHB ruled that DEP must "perform the proper analysis" and "red[o]" its NSR and PSD applicability determinations using the aggregated

---

[20] DEP concluded that Plan Approval C was linked to Plan Approval A and Plan Approval F was linked to Plan Approval B. *See* EHB Adj. FOFs 127, 243, 256; *see also* N.T. at 375, 378, 389, 424-425, 745-748; N.T. Exs. A-20 at 4, A-25 at 3.

19

emissions from Projects 1 through E and RFD 5236 and the projects approved thereafter. EHB Adj. at 74.

Sunoco argues, based upon this Court's holding in *Department of Environmental Resources v. Big B Mining Co., Inc.*, 554 A.2d 1002 (Pa. Cmwlth. 1989) that, because the EHB's conclusion that emissions from Projects 1 through E and RFD 5236 shall be aggregated and will not change on remand, whether DEP properly analyzed Project E's stand alone NSR and PSD requirements, will evade review without this interlocutory appeal. At issue in *Big B* was a regulation that protected high quality waters from being degraded by effluent discharges. The regulation authorized some stream degradation only if certain conditions were met. DEP concluded that, since the applicant mining company did not satisfy the regulatory conditions, it issued a permit limited to effluent levels that did not degrade the stream.

On appeal, based upon its interpretation of the regulations, the EHB reversed, holding that since the mining company demonstrated compliance with the regulation, some stream degradation was permitted. However, the EHB remanded the matter for DEP to assess the allowable effluent limitations. DEP appealed to this Court, which concluded that, since "the EHB finally determined that the mining company satisfied the regulation requirements, and that determination would not change on remand[,] . . . **the final determination** of regulation satisfaction **could be reviewed**" **on interlocutory appeal to this Court**. *Sentinel*, 2 A.3d at 1267 (emphasis added).

DEP and CAC argue that the instant appeal is more akin to *Sentinel* than *Big B*. *See* DEP Br. at 15; CAC Br. at 13. In *Sentinel*, a developer applied for a storm water permit for a construction project near Holland Run. DEP granted the permit after determining that construction would not result in the direct storm water discharge into Holland Run and, thus, met DEP guidelines for a nondischarge site.

Local community organization Crum Creek Neighbors (CCN) appealed to the EHB to have the permit revoked. At the EHB hearing, CCN presented expert testimony that larger storms would discharge surface water, and neither party presented evidence of subsurface water impact (i.e., hydrogeology). Based upon the evidence before it, the EHB ruled that DEP erred by treating the construction site as a nondischarge site, suspended the permit and remanded for DEP to conduct additional fact-finding regarding the project's impact on the subsurface water.

The developer appealed to this Court, arguing *inter alia* that the EHB's decision was not supported by sufficient scientific evidence. Regarding appealability, the developer argued that because the EHB's conclusion that CCN's scientific evidence was sufficient, its issue on appeal would be irreparably lost on remand. This Court disagreed and quashed the appeal as interlocutory, reasoning:

> After DEP conducts its review, it will either restore the permit or revoke it. Any aggrieved party can then appeal. The EHB can then review the permit in light of the additionally gained information. The issues here relating to the overflow and to the hydrogeology can then be fully addressed with a fully developed record.
>
> . . . .
>
> [T]he EHB did not finally address any aspect of the permit. The EHB specifically indicated that it was not revoking the permit, but that it was not 'particularly receptive . . . based on the existing record' to 'simply approv[ing] the permit and dismiss[ing] the appeal.' [*Sentinel*] EHB [No. 2007-287-L] Dec. at 18. Rather, the EHB accepted many of the concerns and questions raised by CCN and its experts as to the methodologies used by [the developer] and DEP, and has remanded the matter for further evaluation of the permit under appropriate methodologies.

*Sentinel*, 2 A.3d at 1267.

The instant appeal has characteristics of both *Big B* and *Sentinel*. The EHB exercised its discretion, declared that DEP erred in issuing the permits and

directed DEP to reexamine its actions subject to the EHB's conclusions. Similar to *Big B*, the EHB conclusively established the baseline from which DEP's re-assessment must begin. And, like in *Sentinel*, rather than revoke the permit, the EHB remanded to DEP "for further evaluation of the permit under appropriate methodologies." *Sentinel*, 2 A.3d at 1267. Although neither case is directly on point, *Sentinel* is more factually similar to the present matter than *Big B*.[21]

We acknowledge that this Court has permitted immediate appeals from interlocutory orders pursuant to Rule 311(f)(2) in cases in which the lower tribunal decided the merits of the case before remanding it for further action. *See Vanvoorhis v. Shrewsbury Twp.*, 176 A.3d 429 (Pa. Cmwlth. 2017) (an order that settles the only point of contention between the parties before remand is immediately appealable); *see also Schultheis v. Bd. of Supervisors of Upper Bern Twp.*, 727 A.2d 145 (Pa. Cmwlth. 1999) (immediate review granted where trial court decided the merits before remanding the matter); *Big B*; G. Ronald Darlington, Kevin J. McKeon, Daniel R. Schuckers, Kristen W. Brown and Patrick Cawley, 20 *West's Appellate Practice* § 311:133 (2018-2019 ed.) (where the remand order directs a particular outcome or forecloses issues, it is appealable under Rule 311(f)(2)). However, where the EHB did not direct the outcome of DEP's permitting decision, such that "it is not clear what will occur upon further evaluation by DEP[,] . . . what will happen with the permit, why it will happen, and which party, if any, will be aggrieved[,]" the EHB's order was not immediately reviewable. *Sentinel*, 2 A.3d at 1267; *see also Mangan v.*

---

[21] CAC claims the distinguishing factor between *Big B* and *Sentinel* is that, in *Big B*, DEP filed the interlocutory appeal, while, in *Sentinel*, the developer appealed. CAC points out that those and the other cases Sunoco relies on are inapposite because the initially deciding governmental body (rather than aggrieved private parties, like in this case) filed the interlocutory appeals. *See* CAC Br. at 15-18. CAC convincingly argues that since there is no mechanism for DEP to appeal under the EHB Act, when DEP is allegedly aggrieved by an EHB remand order, that order is final as to DEP, so DEP's sole option is an interlocutory appeal to this Court. It is not a private party's only option.

*City of Carbondale Zoning Hearing Bd.* (Pa. Cmwlth. No. 1143 C.D. 2011, filed June 27, 2012) (where the trial court's order did not decide the merits before remand, there was no issue capable of evading review).[22]

Here, CAC appealed from Plan Approval E to the EHB claiming that DEP erred by treating Project E as a stand-alone project and by undercounting the emissions increases, thereby allowing Sunoco to avoid applying NSR and PSD requirements. The EHB concluded that, since the EHB was not authorized to do so, Sunoco's and DEP's Project E NSR and PSD applicability determinations "**must be redone**," such that emissions from Projects 1 through E are aggregated as part of the new Plan Approval E applicability determination, and DEP must also consider whether Post-Dated Plan Approvals should also be aggregated therein. EHB Adj. at 74 (emphasis added). The EHB recognized that "Sunoco maintains some discretion in formulating the data used in a **revised application**, and . . . there is no 'correct' set of NSR calculations." EHB Adj. at 74 (emphasis added). Thus, despite that the EHB ruled that Projects 1 through E shall be aggregated, it nevertheless tasked DEP with reevaluating which emissions sources and levels will be aggregated on remand. Since the EHB did not revoke Plan Approval E, and "it is not clear . . . what will happen [with Plan Approval E on remand], why it will happen, and which party, if any, will be aggrieved[,]" *Sentinel*, 2 A.3d at 1267, this Court cannot conclude that the EHB decided the merits before remand and that its aggregation ruling will evade review if not immediately appealed.[23] Accordingly, the EHB's Adjudication is not appealable as of right under Rule 311(f)(2).

---

[22] This Court acknowledges that its unreported memorandum opinions may only be cited "for [their] persuasive value, but not as binding precedent." Section 414(a) of the Commonwealth Court's Internal Operating Procedures, 210 Pa. Code § 69.414(a). *Mangan* is cited herein for its persuasive value.

[23] Notably, "[b]ecause the EHB has not revoked Sunoco's [P]lan [A]pproval [E], Sunoco may continue to operate [pursuant thereto] in the meantime, subject to DEP's [R]egulations." CAC

There is no merit to Sunoco's claim that it will be precluded from later challenging the EHB's Project 1 through E aggregation ruling, or applicability of the administrative finality doctrine thereto, if this appeal is denied. Section 4(c) of the EHB Act specifies that "no action of [DEP] adversely affecting a person shall be final as to that person until the person has had the opportunity to appeal the action to the [EHB]." 35 P.S. § 7514(c). Moreover, it is well settled that "an appeal of a final order subsumes challenges to previous interlocutory decisions[.]"[24] *Betz v. Pneumo Abex, LLC*, 44 A.3d 27, 54 (Pa. 2012); *see also Franciscus v. Sevdik*, 135 A.3d 1092, 1093 n.1 (Pa. Super. 2016) ("[O]nce a final, appealable order has been appealed, any prior interlocutory order can be called into question.").

Although this Court has held that appeals after parties are permitted to submit revised plans on remand are limited to issues related to the tribunal's review of the revised plans, *Vanvoorhis*; *Schultheis*, it is not entirely clear in the instant matter whether Sunoco will submit a revised Plan Approval E application for DEP's reconsideration, or DEP will simply re-evaluate Sunoco's original application. In either event, Eckert confirmed that joining past and future projects with Project E could change DEP's calculations, *see* N.T. at 738, 816-817, thus, the EHB's directions on remand necessarily require DEP to re-examine Project E's emissions relative to Projects 1 through D and RFD 5236 and, potentially, add potential emissions from Projects F through H. If either CAC or Sunoco are unsatisfied with Plan Approval E after DEP's decision on remand, they may appeal to the EHB and, thereafter, to this Court.

---

Quashal Application at 12; *see also* EHB Adj. at 75 (the EHB refused to revoke Plan Approval E and Sunoco's construction pending remand).

[24] "Failure to appeal an interlocutory remand order that could be appealed under [Rule] 311(f) will not result in a waiver of the objection to the order, such that an objection may be raised on any subsequent appeal in the matter from a final determination on the merits." 20 *West's Appellate Practice* § 311:134 (2018-2019 ed.).

## Conclusion

Because the EHB's Adjudication is not appealable as of right under Rule 311(f)(1) or (2), this Court lacks jurisdiction, and Sunoco's appeal must be quashed. Accordingly, CAC's Quashal Application is granted.[25]


_____
ANNE E. COVEY, Judge

---

[25] In light of the Court's ruling on CAC's Quashal Application, the Court lacks jurisdiction to address Sunoco's administrative finality doctrine issues.

<u>IN THE COMMONWEALTH COURT OF PENNSYLVANIA</u>

Sunoco Partners Marketing and   :
Terminals, L.P.,   :
      Petitioner   :
        :
    v.      :
        :
Clean Air Council and Commonwealth   :
of Pennsylvania, Department of   :
Environmental Protection,   :   No. 145 C.D. 2019
     Respondents   :

## O R D E R

   AND NOW, this 1st day of October, 2019, the Clean Air Council's Application to Quash this appeal is granted. Sunoco Partners Marketing and Terminals, L.P.'s appeal from the Pennsylvania Environmental Hearing Board's January 9, 2019 Adjudication is quashed.

            _____
            ANNE E. COVEY, Judge